[No. 1802.]

## L. O. Fonville *v.* The State.

1. **FORGERY — FACT CASE.** — To constitute the offense of forgery it is not essential that the forged instrument, if true, will actually discharge or defeat an obligation.     It will be the subject of forgery if it tends to discharge or defeat an obligation.     See evidence *held* sufficient to support a conviction for forgery.

2. SAME — CHARGE OF THE COURT. — Failure of the court to charge the jury upon a question involved in a trial should be objected to, or the accused should seek to supply such omission by requesting a special charge. Otherwise a conviction will not be revised because of such omission, unless prejudice to the accused is made to appear.

APPEAL from the District Court of Tarrant. Tried below before the Hon. A. J. Hood.

The conviction was for the forgery of a receipt for $1.75, in Tarrant county, Texas, on the 12th day of March, 1883. A term of two years in the penitentiary was the penalty imposed.

J. S. Russell was the first witness for the State. He testified that he and the defendant had lived neighbors near the town of Mansfield, Tarrant county, for several years. The witness knew one E. M. Hamby, and had him in his employ during the month of March, 1883. Hamby was present as a witness in this case at the first part of the last term of the court. The defendant was also present at that time. This case was then called, but was postponed until a later day in the term. When the case was reached for trial, Hamby was in attendance to testify, but the defendant did not make his appearance and his bond was forfeited. Having disappeared from his home near Mansfield, the defendant remained absent several months. He returned home some time after. Hamby removed from Texas to Washington Territory.

During the month of March, 1883, and for some time prior thereto, the defendant carried the mail between Arlington, a point on the railroad, and Mansfield, Tarrant county, a distance of fourteen miles. He transported the mail in a hack, and at the same time transported passengers, freight, express packages, etc., for the public. On Saturday, the 10th day of March, 1883, witness was in the town of Mansfield with Mr. Hamby, and the two met the defendant about starting with his mail hack to Arlington. Hamby told the defendant that he was expecting a banjo by express from Iowa, and was informed by the defendant that it was then in the express office at Arlington. Hamby then requested the defendant to bring it on his return trip from Arlington; which defendant agreed to do. On that evening Hamby took home with him a banjo that had been expressed to him from Iowa.

On Tuesday morning following, March 13, 1883, witness and Hamby were traveling together in a wagon from Mansfield towards defendant's house, which is about one mile distant from Mansfield. They met the defendant, who was alone in his hack, going towards

Mansfield, and stopped to talk with him. Defendant got out of his hack, came to the wagon, with a paper in his hand, and said to Hamby: "Here is your receipt for the money you paid me on the express package I brought you last Saturday. The express charges were $1 on one road, seventy cents on the other, and twenty-five cents I charge you for taking it to you, which was little enough, and that makes the $2 you paid me. You are the second man who ever asked me for a receipt." He then handed the receipt to Hamby, who looked at it and then handed it to witness with the request to keep it for him as he had no pocket-book. Witness took it, looked at it, and saw that it was a receipt for $1.75, and then placed it in his pocket-book. Hamby made some remark about the charges being rather high, and drove on. Witness carried the receipt for a week or two, when he returned it to Hamby, who took it to Arlington with him. Witness saw the receipt again some time later in the grand jury room. The receipt now shown witness is the receipt handed to Hamby by the defendant in the manner and on the day stated, and is the same receipt of which the witness was now testifying. This all took place in Tarrant county, Texas, and during the time stated.

Cross-examined, the witness stated that he had no ill feeling towards the defendant, but, on the contrary, entertained neighborly feelings for him. When the witness heard that the defendant was suspected of forging the receipt, he did not go to him and tell him of it. Witness was having his eyes treated by a physician during the time that the defendant drove the mail hack and frequently rode with defendant to and from Arlington; for which the defendant charged him only half price. When defendant's counsel asked witness, on the morning of this trial, about the receipt, the witness told him that it was in the hands of the prosecuting attorney. Witness did not refuse to talk to the defendant's counsel about this case, but answered all his questions according to his knowledge.

W. O. Middleton was the next witness for the State. He testified that in March, 1883, he was the agent of the Texas Express Company at Arlington, Tarrant county, Texas. He was acquainted with the defendant and had known him for two or three years. During the month of March, 1883, and for some time prior thereto, the defendant carried the mail in a hack to and from Arlington and Mansfield in said Tarrant county. He very often transported packages from Arlington to people who lived at Mansfield, or on his route. On the 12th day of March, 1883, he came to the express office and called for a package for T. B. Loftin. Witness gave him

the package, which was a small box, the express charges on which were $1.10. Defendant paid the express charges and the witness wrote and gave him a receipt for the same. This was written on an ordinary blank receipt, kept and sold by all stationers. The company kept no blanks of its own, as it was not in the habit of giving receipts for express charges. These ordinary blank receipts spoken of by the witness were kept in the office so scattered about that they were accessible to anybody.

On the same day, the defendant returned to the office and asked for an express package — a banjo — addressed to Mr. E. M. Hamby. Witness gave him the banjo and received from him the express charges, $1.35. Witness did not give a receipt for this money, as the defendant said that he did not have time to wait for it, but that if Hamby wanted a receipt he would get it on his return trip. Defendant signed the express company's books for receipt of both packages. Those books show the amount of charges, and by whom and when paid. Witness heard nothing more of this transaction with the defendant until about ten days had elapsed, when Mr. Hamby came to him and asked him how much the defendant had paid as expressage on the banjo. Witness examined the books and told him that the amount was $1.35. Witness remembered the amount independent of the books, but made the reference to verify his memory. Hamby then showed the witness the receipt in evidence. It is written on the same kind of blank that the witness used in writing the Loftin receipt. Witness did not execute this receipt, nor did he authorize any one to write or execute it for him. Witness's name appeared signed to it, but was not signed by him or his authority. Witness did not receipt to the defendant or any other person for the money paid to him on the Hamby express package, nor is the receipt in evidence in the witness's handwriting. Witness had been in business for several years, and his experience in handwriting during that time had been considerable. He had seen the defendant write, and was familiar with his handwriting. In the opinion of the witness, the receipt was in the handwriting of the defendant. Comparing it with the application for a postponement of the trial, confessedly signed by the defendant, the witness declared the signature " Fonville " signed to that document, and the name " Fonville " written in the body of the receipt, to resemble strikingly.

At present, and in March, 1883, witness was conducting a drug store in Arlington, in which he transacted the express business. He had in March, 1883, a clerk named Glover. Glover had no con-

nection whatever with the express business, and no authority to give receipts for money paid as express fees. The receipt in evidence is not in Glover's handwriting. The handwriting in this receipt is very good, whereas Glover's handwriting was so poor that he could scarcely sign his own name in a legible manner. The blank on which this receipt is written is similar to a large number which lay loose about the drug store, of easy access to the public. In signing receipts for the express company, the witness usually signed only his surname, thus: "Middleton, Agt." At this point the State introduced the receipt in evidence. It is as follows:

"ARLINGTON, 3 — 12 — 1883.

"Received from L. O. Fonville, one 75-100 dollars, on freight for E. M. Hamby.

"$1.75.                               MIDDLETON, Agt."

The witness was then shown another paper, and testified that it was the receipt he gave the defendant for money paid by him as freight on the T. B. Loftin express package. The amount of the charges on that package were $1.10, and that was the amount paid by the defendant, and the amount for which the defendant receipted. This receipt, since its execution by the witness, has been changed from $1.10 to $1.70. The cents in this receipt were expressed in figures, and the change has been made by changing the 1 in the figure 10 to a 7. This change is made both in the body and on the margin of the receipt, and in both places is perfectly apparent. Witness saw this receipt but a short time after it was executed by him, and it had then been changed. The receipt was in the hand-writing of the witness, but the change or alteration described was made without his knowledge or consent.

On cross-examination, the witness stated that when, on the morning of this trial, the defendant's counsel asked him whether it was the defendant or his son Jimmie who took the packages described from the express office, he replied that he could not remember with absolute certainty, but thought it was the defendant himself. Since then the witness had reflected carefully over the matter, and was now positive that the defendant himself got the packages. Witness had not conversed about this case with the prosecuting attorney or anybody else, until the day of this trial, since his examination before the grand jury. The defendant's son Jim drove the mail hack sometimes, but the witness had not seen him for some two or three weeks before the delivery of the express packages to the defendant, and has not seen him since. The rumor that Jim had left the country was prevalent about Arlington. During the witness's

occasional absences from his place of business, never exceeding two or three days visits to either Fort Worth or Dallas, Mr. Glover conducted his business, including the delivery of express packages. Witness had never known Glover to give receipts for express package fees, and if he ever did so, which was possible, he did so without express authority from the witness. Witness had no recollection of ever having either authorized or forbidden Glover to sign receipts for express package fees.

T. B. Loftin was the next witness for the State. He testified that on Monday, March, 12, 1883, he was in the town of Mansfield, Tarrant county, Texas, and saw the defendant in his hack on the eve of starting to Arlington. Witness requested the defendant to get a small express package, then in the express office for him, and bring it to Mansfield. The package referred to was a small box containing glass jars of sample fruit from a Tennessee nursery, for which the witness was acting as agent. · On his return from Arlington that evening, the defendant delivered the package to the witness in front of the postoffice, in Arlington, and told the witness that he had paid the express charges of $1.70, and that he charged the witness thirty cents for his service, and demanded $2, which the witness paid him, remarking at the time that the charges were unreasonably high. Witness waited some time for the defendant to give him the express agent's receipt for the expressage of $1.70, and finally asked him for it. He replied that he took no receipt, but on his return trip to Arlington would get it, if the witness so required him. Witness replied that he wanted the receipt to turn in to the company, which was responsible to him for such expenses. On his arrival in Mansfield from Arlington on the next evening, the defendant came to the witness, who was standing in a crowd of gentlemen, and handed him the receipt in evidence, with the remark that the witness was the first man who ever required a receipt of him. He then walked off. Witness opened the paper and found it to be a receipt for $1.70. It appeared to have been altered by changing an original $1.10 in the manner described by the witness Middleton. To this fact the witness called the attention of the gentlemen with whom he was then talking, and afterwards the attention of other persons. At this point the State introduced the said receipt in evidence. It reads as follows:

"ARLINGTON, 3 — 12 — 1883.

"Received of L. O. Fonville, one and 70-100 dollars on freight for T. B. Loftin.

"$1.70.                                MIDDLETON, Agt."

The State next introduced in evidence the records of the court, and showed that the defendant's recognizance in this case was forfeited on the 5th day of October, 1883. It was also proved by the sheriff that the defendant was afterwards re-arrested on an *alias capias.*

A number of witnesses testified that prior to this charge the defendant's reputation for honesty in the neighborhood in which he lived had been good. About an equal number testified, for the State, that the defendant's reputation for honesty in the neighborhood in which he lived had been bad for several years before this charge was brought against him.

The defendant's wife was the first witness introduced in his behalf. She testified that she and her husband lived about one mile north of Mansfield, on the Mansfield and Arlington road. The witness Russell lived on the same road about one and a half miles still further north. Witness remembered the occasion on which her husband freighted an express package for Mr. Hamby from Arlington to Russell's. Jimmie, the son of the witness and the defendant, was at home at and before that time. He drove the defendant's mail hack to and from Arlington a great portion of the time. Witness was present when Hamby paid her husband for the expressage and carriage of the package. This payment was made at the defendant's house between sundown and dark. Defendant had taken the mail from Arlington to Mansfield, and had just reached home. Jimmie and one Harry Williams were unhitching the horses from the hack in the yard. Witness was standing on the porch. Mr. Hamby stopped his horse in the road, near the fence, some twenty-five or thirty steps from the house. Defendant and Hamby talked awhile, and presently so elevated their voices that witness could hear them distinctly. Hamby asked the defendant the amount of the charges on the package. Defendant told him that the express charges were $1.35, and that he charged him forty cents for his trouble in bringing it. Hamby, in a somewhat loud and angry voice, said that the charges were too much. Defendant then said to Hamby: "Come back and give me the dollar and thirty-five cents I paid out for you and you can have my charges." Hamby turned back, paid defendant, and said: "Now I want a receipt." Defendant turned to his son, and said: "Jimmie, when you go to Arlington get a receipt for Mr. Hamby," and walked up to the gallery where the witness was. As he stepped up witness remarked: "He paid you sure enough." Defendant made no verbal reply, but extended his hand showing a dollar, a half dollar, and a twenty-five cent piece, all in silver.

A day or two after this occurrence, after defendant had started for the Mansfield mail to take it to Arlington, Jimmie, who was horseback on his way to the field, called to the witness in the house, to go up stairs and look in his overcoat pocket where she would find the Hamby receipt, which he directed her to give to the defendant as he passed the house from Mansfield on his way to Arlington. Witness did as desired, found but the one paper in the pocket, and, as she got down stairs, she saw defendant with his hack coming from the direction of Mansfield. Witness read the receipt on her way to the front fence to give it to the defendant, and saw that it was the Hamby receipt. She gave it to the defendant and started back to the house, but just at that time saw Hamby and Russell coming around the corner of the fence in a wagon, going towards Mansfield. Defendant did not put the receipt in his pocket, but stopped his hack, and said to Hamby: "Here is your receipt." Hamby got out of the wagon, went to the hack, got the receipt, looked at it and handed it to Russell. Witness was then about seventy-five yards from the parties.

On the day after the occurrences last recited, the witness's son Jimmie ran away from home and has not been seen by the witness since. He first went to the field on that morning, returned after a short time, changed his clothes, got on his horse and rode off, saying he was going to Mr. House's for some purpose, and he has never since been back. The sheriff of Archer county, Texas, was a brother of the witness, and, under the impression that her son had gone to him, the witness had, since this prosecution was instituted, procured the issuance of an attachment to that county, which had been returned not found. Witness had received but one letter from Jimmie, and he was then traveling. She had advertised for him in the "Fort Worth Live Stock Journal," but had been unable to hear from him. It was her impression, however, that he was still in Texas somewhere, engaged in driving or herding stock. He left Tarrant county before the defendant was accused of this offense.

Being shown the receipt in evidence, the witness stated that, in her opinion, it was the identical instrument she got from her son's overcoat pocket. It was written with a blue indelible lead pencil, and was not, in the opinion of the witness, in the handwriting of the defendant. Being shown the Loftin receipt, the witness recognized it as one she saw for the first time at the supper table at her house. When exhibited on that occasion there were present at the table the defendant, the witness, her two small children, her son Jimmie, who had just got in with the mail, and one Harry Will-

iams, who was then in the employ of the defendant. Jimmie took the paper from his pocket with the remark that he had that day secured the Loftin receipt. He then handed it to witness, who looked at it and offered it to defendant, who told her to read it to him, as he did not have his spectacles convenient. Witness read it as requested. It was then, as now, a receipt for $1.70. Witness passed it to her husband, who placed it in his pocket. The figure seven in the cents mark is blotched. When arrested, the defendant was placed under bond, with L. H. Stephens and H. W. Speer as his sureties. He left home in October, 1883, saying he was going to Fort Worth, and witness saw no more of him until December. In the mean time his bond was forfeited. Witness ascertained his whereabouts, and wrote him to come home. He did so and was arrested.

Cross-examined, the witness stated that when the defendant left home, he left the State. At all events she received letters from him mailed from another State. Mr. Stephens got witness to write the defendant to return, agreeing that if he would return, and deed him, Stephens, his homestead, he, Stephens, would go on his bond again. This agreement was carried out.

Harry Williams testified, for the defense, that he was in the employ of the defendant in March, 1883. Witness was in Mansfield standing on the platform in front of the postoffice on the day that defendant brought a package from Arlington to Mr. Loftin. When defendant gave Loftin the package, that gentleman asked him the amount of the charges. Defendant replied that he paid expressage to the amount of $1.10 and charged sixty cents for his service. Loftin paid the defendant a sum, and asked defendant if he had a receipt. Defendant said no, but that he would procure one. He also remarked to Loftin that he was the first man who had required a receipt of him. Jimmie Fonville was in town somewhere at the time, but not with the witness.

The opinion discloses all other matters of fact.

*Furman, Stedman & Capps,* for the appellant. We submit, 1st, that the instrument alleged to be forged would not, if the same were true, have created, increased, diminished, discharged or defeated any pecuniary obligation, or have transferred, or in any manner have affected, any property whatever. (Penal Code, art. 431.) The indictment in this case charges that the alleged forged instrument "would, if the same were true, have discharged and defeated certain pecuniary obligations." We submit that, though

th appellant did make the said instrument without lawful authority and with a fraudulent intent, still he is not guilty, under the law, of forgery, because the said instrument would not (if true) discharge or defeat any pecuniary obligation.

And the instrument, before it can be the subject of forgery, must not be invalid upon its face. (See *Howell* v. *The State*, 37 Texas, 592; Bishop on Criminal Law, vol. 1, p. 506.) And there must at all events be a possibility of some person being defrauded by the forgery. (3 Greenl. Ev., sec. 103, p. 89.) 'Tis not simply the false making of a false instrument, with a fraudulent intent, that constitutes a forgery, but the instrument must be such that it would legally convey or divest a legal right. (22 Amer. Dec., p. 312; 37 Texas, 593.)

"Forgery is the false making or materially altering, with intent to defraud, of any writing which, if genuine, might apparently be of legal efficacy, or the foundation of a *legal liability*." (Bishop on Criminal Law, vol. 1, p. 1008.) And in this case, the instrument in question must be such upon its face that it would "discharge and defeat a certain pecuniary obligation." By pecuniary obligation is meant "every instrument having money for its object, and every obligation for the breach of which a civil action for damages may be lawfully brought." (Penal Code, art. 440.)

Then before an instrument can be the subject of forgery it must be such as would be the foundation of a legal liability, or would defeat a legal liability. (22 Amer. Dec., p. 312 and notes.) Whom would the receipt in question discharge from any legal liability? Hamby, it is true, was under a legal liability to pay the express company (Middleton, the agent) the charges on the express package carried by said express company for the benefit of Hamby, and if the package had been delivered to Hamby, without express charges being first paid, the express company would have had an action against Hamby for amount of charges. Then would Hamby defeat or discharge the action by producing receipt? or would he not plead *payment*, and offer the receipt of Middleton as evidence that he had paid the charges?

What is meant by an instrument "which if true?" We understand by *true* is meant that the instrument was made by him by whom it purports to be; and in the case at bar the instrument, "*if true*," was made by "Middleton, agent." And if there was any legal obligation that could be discharged or defeated by said instrument, it was the obligation Hamby was under to pay the express company the charges for carrying the package. Now, we will

suppose the company sue Hamby, and Hamby pleads his receipt, setting it out, would he not be demurred out of court? Would not the proper answer be to plead payment, and upon the trial of the case offer in evidence of his plea the receipt of " Middleton, agent?" And even then, though the receipt was as pleaded, " *true,*" made by Middleton, would the receipt be conclusive or only *prima facie* evidence of payment, and could not the express company explain the receipt away by parol testimony? Is it possible for a receipt to discharge or defeat any pecuniary obligation — rather is it not only *evidence* of the discharging of a pecuniary obligation?

Now, a pecuniary obligation may be discharged and defeated by a forged instrument. Say A mortgages his property to D, and C, representing himself as D, or the agent of D, releases the mortgage. Then C would be guilty of forgery — because the release itself would transfer property to A, or the release is such an instrument as, within itself, conveys a right, and not evidence of it. As does a note create a legal liability of the maker to pay the sum named in it to the holder, and in bringing suit upon it the pleader would simply declare upon the note, without further explanatory allegations, and upon trial would, without any explanatory evidence, introduce this note and obtain judgment thereupon.

While in order to introduce as evidence a receipt, the pleader must plead explanatory matters, and upon trial prove not only execution of receipt, but the other allegations of his pleadings as to why the receipt was executed, as a receipt does not upon its face carry any inherent qualities of a legal obligation, or the discharging of a legal obligation, as does a note or the release of a mortgage. It is true a note may be said to be only evidence of a legal liability, but it is such evidence that, by reason of its own inherent quality, it creates and conveys a legal liability, and it may be transferred, thereby conveying a valuable right; or in other words it is a " chose in action," while a receipt is not, and if transferred what right could it convey? Then we submit that a receipt cannot be the subject of forgery.

Further, we submit that if a receipt can be the subject of forgery, that considering the peculiar facts in this case, if the appellant did make the receipt in question, yet he is not guilty of forgery; because the witnesses all agree that the appellant did not give the receipt to Hamby at the time Hamby paid him for bringing the package, and that by exhibiting the receipt to Hamby, Hamby was induced thereby to pay appellant more money, or money he would not otherwise have paid him, but on the contrary Hamby paid appellant; and

that appellant, two or three days thereafter, gave Hamby the receipt, and therefore, if appellant had any fraudulent intent, it was to cover up a little swindle he had perpetrated, and the instrument could not have accomplished any purpose, other than to cover up a swindle.

According to the State's own testimony, Hamby was not induced to part with any money or property by reason of the receipt, but if he parted with more money than he should have done, it was on account of the representations of appellant made at the time the money was paid, and previous to the time that the receipt was given.

Again, according to the State's testimony, appellant did pay to Middleton, agent, express charges to the amount of $1.35 of his, appellant's, money. And the receipt is claimed to be for $1.75. Therefore appellant was entitled to collect from Hamby, in addition to his own charges, the $1.35 he paid Middleton, and if any legal liability was created, increased, "discharged and defeated" by said instrument, it could only be to the amount of forty cents, and not to the amount $1.75, so that any civil action for damages (Penal Code, art. 440) based upon said instrument would not be "lawfully brought"— if an action could be brought — without alleging explanatory facts.

And there can be no forgery unless a civil action for damages would lie against the party perpetrating the forgery.

Then, say Hamby sues appellant for the forty cents thus fraudulently obtained, he would not base his action upon the receipt, but would sue for forty cents obtained by means of false representations, and would aver and prove that appellant was entitled to receive $1.35, and the receipt purporting to be the act of Middleton could not be introduced as evidence in the case, without first proving its execution by Fonville, and then it would be of no more validity than parol testimony and might be explained away by parol testimony. And Fonville in defense of said action might prove that his services for carrying said express package from Arlington to Mansfield, were worth the forty cents, and also the twenty-five cents that the State's witness Russell testifies Fonville's charges were, thereby defeating any civil action for damages that might be brought against appellant.

Again, we submit that if appellant was at the time of the alleged forgery a common carrier, and that if he and the express company, then represented by witness Middleton, constituted connecting lines of carriers, then appellant had a right to receipt for the entire charges, and that if appellant believes as a matter of law that he had authority to sign Middleton's name, although he did not have

such authority, then the appellant was entitled to an acquittal, and that the court erred in refusing to submit to the jury special charge No. 2, asked by appellant.

We submit that to constitute the false making of an instrument, forgery, there must be in the mind of the maker, at the *time* he executed the instrument, an intent to injure, or defraud (Penal Code, art. 431), and that the injury must be such as "affects one pecuniarily or in relation to his property." (Penal Code, art. 433.)

From the evidence, as we have before stated, the receipt was not made at the time the money was paid, or for the purpose of obtaining the money, but was given to Hamby, according to Russell's testimony, three days after the money was paid; and we hold that if appellant made said instrument, it was only to cover up a swindle, and that the court should have submitted to the jury the special charge No. 1, requested by appellant.

Upon the trial of this case the appellant objected to the introduction of the T. B. Loftin receipt for any purpose, and to all evidence pertaining to said receipt.

We submit that, in proof of the "criminal uttering of forged instruments," it is essential to prove a *guilty knowledge;* and that to prove this fact, evidence is admissible that he had about the same time uttered, or attempted to utter, other forged instruments of the same description. (3 Greenl. Ev., sec. 111.) But such evidence is only admissible for the purpose of showing *guilty knowledge* or intent in criminal utterings (*Francis* v. *The State*, 7 Texas Ct. App., 501); and it is not admissible when defendant is accused of *making a false instrument;* and that before such evidence is' admissible there must be strict proof that the instruments offered are forgeries (*Ham* v. *The State*, 4 Texas Ct. App., 674; 3 Greenl. Ev., sec. 111); and the instruments must be similar. The instrument offered was dissimilar to that defendant was accused of making in this case. The witness Middleton acknowledged that he executed the Loftin receipt introduced as evidence on trial of this case, but stated a figure 1 in it had in two places been changed to a 7. And the witness Loftin testified that he paid the money to the appellant the day before appellant gave him the receipt.

And we submit that if the said Loftin receipt was so allowed to be introduced as evidence, it was the duty of the court to instruct the jury for what purpose said evidence was admissible; for it has been most justly held by our learned appellate court in the case of *Francis* v. *The State*, 7 Texas Ct. App., 501, that "where evidence of collateral or of a distinct offense is admitted as proof of the

guilty knowledge or intent of the accused, the charge of the court should apprise the jury of the legitimate scope and purpose of such evidence, and thus guard them against treating it as proof of the *corpus delicti.*" And in no part of the charge of the trial judge does he instruct the jury for what purpose said Loftin receipt was introduced, so that the defendant was virtually upon trial for two offenses — forgery of Hamby receipt and of Loftin receipt — and from the verdict of the jury we are at a loss to know which of said receipts they found accused guilty of forging.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for forgery, with two years' confinement in the penitentiary as the punishment.

There is but one debatable question presented in the record; and that is, whether, under the facts of this case, appellant committed forgery under our Code.

The evidence shows that the appellant was, on the 12th of March, 1883, and previous thereto, engaged in carrying the mail between Arlington and Mansfield; that he carried the mail in a hack; that he carried express packages and passengers and bundles for parties on the hack line — or, in legal phraseology, he held himself out as a "common carrier." That on Saturday morning, the 10th day of March, 1883, one E. M. Hamby requested appellant, who was then in his hack, at the town of Mansfield, about starting to Arlington with mail, to bring for him, Hamby, an express package that was then in the express office at Arlington. The appellant brought the package for Hamby. That Hamby, at the time the package was delivered to him by appellant, on Saturday, paid the charges. That appellant three days thereafter, on Tuesday, the 13th day of March, gave Hamby the receipt in question. That at that time Hamby paid appellant nothing, but that the money paid appellant for which the receipt in question was given was paid on Saturday, the 10th of March.

Appellant paid Middleton, the agent of the express company at Arlington, $1.35, the charges on a banjo, the property of Hamby, the prosecutor. Appellant received from Hamby $1.75, representing that that amount had been claimed and charged by the company as the express charges on the banjo. After Hamby had paid the $1.75 to appellant, he requested appellant to get a receipt from the agent. This was not done, but instead thereof appellant forged a receipt for $1.75, purporting to have been signed by Middleton, the agent

of the company, and delivered it to Hamby. The receipt is as follows:

"Arlington, 3—12, 1883.

Received from L. O. Fonville, one 75–100 dollars on freight for E. M. Hamby.

"$1.75.                                        Middleton, Agent."

The indictment alleges that this instrument, if true, would have discharged and defeated a certain pecuniary obligation. It is urged by counsel for appellant that the receipt, under the circumstances of this case, could not have the effect to discharge or defeat a pecuniary obligation, and that therefore appellant is not guilty of forgery.

Let us suppose that Hamby has ascertained that appellant had only paid Middleton $1.35 instead of the $1.75, and had instituted suit for the forty cents, will it be contended that, if Middleton's receipt was absolutely true, Hamby's suit would not be defeated? Appellant having only paid Middleton $1.35, and receiving $1.75 from Hamby, he was by this transaction placed, in conscience and law, under a pecuniary obligation to Hamby, to the amount of forty cents. And for this amount, though small indeed, Hamby had a right of action against appellant. Now suppose suit instituted; upon the trial, if indeed he had paid Middleton, as is stated in the receipt, $1.75, certainly the pecuniary obligation of him to Hamby would have been defeated.

Again, it is not required that the instrument, if true, should in fact discharge or defeat the obligation; it will be the subject of forgery if its tendency is such.

About the same time of this forgery, another transaction, precisely similar to this, was introduced in evidence against the defendant, over his objections. In this there was no error.

It is urged, however, by counsel for appellant, that, conceding the evidence to be competent, the court should have instructed the jury for what purpose the evidence could be used. This last proposition is correct, but, looking to the statement of facts — all of the facts — for this court to reverse the judgment for such error it must appear to us that appellant was probably injured by the failure of the court to control this matter in the charge. It must be borne in mind that appellant did not, at the time, object to the charge, because of this omission, nor ask the proper charge, nor a new trial, because of this defect in the charge. For the first time this point is raised in this court, and as it does not appear that appellant has been injured, we will not reverse the judgment because of this error.

Opinion of the court.

We have examined the other matters relied upon for a reversal of the judgment; but do not think they, or either of them, will authorize us in disturbing the judgment. The judgment is affirmed.

*Affirmed.*

[Opinion delivered at Tyler, November 29, 1884. Motion for rehearing overruled at Galveston, February 4, 1885.]